## UNITED STATES FEDERAL COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

| | | |
|---|---|---|
| **BETTY A. LISTENBERGER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Cause No.: 1:05-CV-421** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **JO ANNE B. BARNHART,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

### I. INTRODUCTION

Plaintiff Betty A. Listenberger seeks judicial review[1] of the final decision of the

Defendant Commissioner of Social Security, who found that Listenberger was not entitled to

Social Security Disability Insurance Benefits ("DIB"). (*See* Docket # 1.) For the reasons set forth

herein, the Commissioner's decision will be AFFIRMED.

### II. FACTUAL AND PROCEDURAL BACKGROUND[2]

Listenberger filed a claim for DIB in March 2003, alleging a disability onset date of

January 15, 1999.[3] (Tr. 86-88, 113.) After her claim was denied initially and upon

reconsideration, Administrative Law Judge ("ALJ") Frederick McGrath conducted a hearing on

October 13, 2004, and rendered an unfavorable opinion on March 4, 2005. (Tr. 12-24, 36, 75-

---

[1] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

[2] The administrative record in this case is voluminous (486 pages), and the parties' disputes involve only small portions of it. Therefore, in the interest of brevity, this opinion recounts only the portions of the record necessary to the decision.

[3] Listenberger claims that she also filed a claim for Supplemental Security Income; however, the record does not support this contention. (*See* Tr. 113-14.)

82.) The Appeals Council denied Listenberger's request for review. (Tr. 8-10.) Listenberger filed

here on December 15, 2005, seeking review of the Commissioner's decision, and the matter is

now fully briefed.

Listenberger was born on July 6, 1948, and is a high school graduate. (Tr. 86, 96.) From

1988 until 2002, Listenberger worked at the Tokheim Corporation, where she was a paint

screener, press brake operator, drill press operator, and assembler. (Tr. 105, 159.) She claims she

can no longer work due to fibromyalgia, peripheral polyneuropathy, and diverticulitis. (Tr. 90.)

**A. Medical Evidence**

*1. Steven D. Ko, M.D.*

On February 9, 2001, Listenberger had an initial rheumatolgy evaluation with Dr. Ko,

who diagnosed "active fibromyalgia with the symptoms of fatigue, unrefreshed sleep, multiple

tender points and headache symptoms, possibly aggravated by social stress factors." (Tr. 368.)

Dr. Ko recommended aqua therapy and toning exercise programs, informing Listenberger that

medication would play a "minimal role" in her treatment. (Tr. 368.) He also indicated that she

would have "waxing and waning periods aggravated by factors such as physical trauma or

emotional stress/distress." (Tr. 368-69.)

*2. Terrence A. Watson, M.D.*

Listenberger initially visited Dr. Watson, her family physician, on January 21, 2002,

reporting that "[c]urrently she's not having any trouble" but that her fibromyalgia pain was

worse in the evening after work. (Tr. 268.) She also indicated that she was currently taking

Neurotin, Ultram, Vicodin, and Celebrex for her fibromyalgia.[4] (Tr. 268.) Returning on February

12, Listenberger complained of pain in her calves and fatigue; Dr. Watson indicated that these

symptoms were probably related to her fibromyalgia and started her on Celexa. (Tr. 266.)

On April 11, Listenberger complained of leg pain after stepping into her husband's truck.

(Tr. 265.) During related visits, Dr. Watson ordered physical therapy and kept her off work three

times, ultimately ordering her back to work on June 10. (Tr. 262-64.) Although Listenberger

reported on May 29 that her leg pain was 75% improved with physical therapy, she called Dr.

Watson's office on June 5 because she had increased pain and swelling and because the area

above her right knee was black and blue. (Tr. 260.) Listenberger was instructed to use pain

medication and ice. (Tr. 260.) On June 6, Dr. Watson referred her to Dr. Kaplansky, a

physiatrist, and continued her off work.[5] (Tr. 260.)

Listenberger visited Dr. Watson again on July 10, complaining of edema in her feet,

ankles, and calves. (Tr. 257.) Opining that she had trace edema in both calves and some

superficial varicosities, Dr. Watson instructed her to elevate her legs as much as possible. (Tr.

257.) A lower extremity venous ultrasound conducted the next day was normal. (Tr. 188.)

On August 12, Dr. Watson noted that although Listenberger had some point tenderness in

her lower lumber area, her range of motion and her gait were normal. (Tr. 255.) Listenberger

followed up with Dr. Watson on September 12, reporting that two epidural blocks she received

from Dr. Kaplansky helped her back pain for a few days each and that her leg pain was basically

---

[4] Ultram and Vicodin relieve "moderate to moderately severe pain." *Physicians' Desk Reference* 1628, 2399 (55th ed. 2001).

[5] Dr. Watson's records reveal that he kept continuing her off work even after she quit her job on August 28, 2002. (Tr. 105, 252, 254.)

unchanged. (Tr. 254.)

On December 12, Listenberger relayed that she continued to have fibromyalgia pain affecting her arms, legs, and spine. (Tr. 252.) She also reported that if she vacuums her entire house she has pain lasting for several days and if she shops for very long she has increased pain for a couple of days. (Tr. 252.) However, she admitted that she was able to cook, do book work at home, and do light cleaning without exacerbation of her pain. (Tr. 252.) Dr. Watson noted that Listenberger needed to take Ambien nightly in order to get a full night's sleep. (Tr. 252.)

When Listenberger visited Dr. Watson on April 12, 2003, she complained that the Ultram was not "covering" her pain. (Tr. 238.) On physical examination, Dr. Watson observed that Listenberger appeared to be in mild distress generally and in moderate distress when she had to get up and walk and that she was tender in her bilateral trapezius muscles and right shoulder. (Tr. 238.) He also noted that Listenberger's fibromyalgia seemed to be getting worse. (Tr. 238.)

On May 22, Listenberger again complained that her fibromyalgia symptoms were worsening, reporting that she was only able to walk through one-quarter of a flea market and that she gets neck and hand pain and tingling when she drives for extended periods of time. (Tr. 235.) She further indicated that she has symptoms for several days after performing any kind of activity and that she is plagued by fatigue. (Tr. 235.) She did relay, however, that Ultracet helps significantly with her pain. (Tr. 235.) On examination, Dr. Watson observed diffuse muscle tenderness but no edema, opining that she had significant limitations with what she was able to do because of her fibromyalgia. (Tr. 235.)

Although Listenberger reported on August 5 that she could not walk through a store without sitting or without help, Dr. Watson indicated that her fibromyalgia was stable. (Tr. 321.)

4

On August 28, she complained of worsening fibromyalgia symptoms with muscle pain, insomnia, stiffness, tiredness, and pain in her lower back. (Tr. 319.) She also relayed that she had some visits with a psychiatrist, which did not help much; however, Dr. Watson opined that she had not gone long enough. (Tr. 319.) On examination, Dr. Watson observed bilateral lower paraspinal muscle tenderness and full range of motion. (Tr. 319.)

On October 9, Listenberger complained of insomnia, "fibrofog", difficulty concentrating, and memory problems. (Tr. 316.) Observing diffuse tenderness, but no swelling, Dr. Watson noted that her fibromyalgia remained stable. (Tr. 316.) Listenberger visited Dr. Watson again on January 6, 2004, indicating that she had musculoskeletal symptoms; that she had one good day out of a week; that she had joint pain, muscle pain, stiffness, and tiredness; and that she was not sleeping well. (Tr. 312.) Dr. Watson observed that Listenberger appeared to be in good health and was ambulatory. (Tr. 312.) On February 9, Listenberger reported that the pain was keeping her awake at night. (Tr. 423.) She complained of muscle pain and stiffness on April 29, but Dr. Watson noted that her fibromyalgia remained stable. (Tr. 305.)

On May 11, Listenberger discussed disability with Dr. Watson, who noted that Listenberger was unable to perform alot of daily activities, had difficulty with simple chores such as shopping and cleaning the house, and usually had one or two good half days per week. (Tr. 310.)  Dr. Watson further observed that Listenberger was on multiple medications, which were helping but not to the point where she could function adequately. (Tr. 310.) Finally, he opined that Listenberger was unable to perform any job, even one where she was severely restricted in her lifting. (Tr. 299, 310.)

Listenberger visited Dr. Watson on June 8, reporting that she had fatigue and unchanged

muscular pains and that Neurontin was helping with "lightning-type" pain. (Tr. 297.) Dr. Watson again noted that her fibromyalgia remained stable. (Tr. 297.) On September 8, Listenberger indicated that she had joint and muscle pain, stiffness, and tiredness, but that the Neurontin was helping. (Tr. 284.) Noting her fibromyalgia remained unchanged, Dr. Watson observed that she had normal range of motion, strength, and function and that she had no swelling, bruising, or abnormalities. (Tr. 284.) Listenberger returned to Dr. Watson on October 4, complaining that her fibromyalgia had worsened and that she had a lot of stress. (Tr. 283.) Dr. Watson instructed her to gradually increase the Neurontin. (Tr. 283.)

On October 8, 2004, Dr. Watson completed a Residual Functional Capacity Questionnaire, indicating that Listenberger met the American College of Rheumatolgy criteria for fibromyalgia and that she suffered from depression. (Tr. 371.) He reported that her symptoms included multiple tender points, nonrestorative sleep, chronic fatigue, morning stiffness, muscle weakness, subjective swelling, irritable bowel syndrome, numbness and tingling, depression, vestibular dysfunction, and chronic fatigue syndrome. (Tr. 371-72.) Dr. Watson opined that emotional factors contributed to the severity of Listenberger's symptoms. (Tr. 372.) He also indicated that in an eight hour work day, she would need to take a twenty minute break every fifteen minutes and would need to elevate her legs. (Tr. 374.) Finally, he opined that she would be absent from work more than four days per month. (Tr. 375.)

### 3. Bryan D. Kaplansky, M.D.

Upon referral of Dr. Watson, Listenberger visited Dr. Kaplanksy, a physiatrist, on June 19, 2002. (Tr. 198.) Her chief complaint was chronic lower limb pain bilaterally; she also reported paresthesias of the hands and feet, as well as low back and gluteal pain and weakness.

(Tr. 198.) She relayed that her symptoms were aggravated by standing, walking, driving, and climbing stairs. (Tr. 198.) On physical examination, Dr. Kaplansky observed that Listenberger ambulated slowly with decreased stride length and that her trunk and cervical range of motion were restricted and caused mild discomfort. (Tr. 199.) Furthermore, hip flexion and rotation caused discomfort on the right and tightness on the left, and passive knee motion caused low-grade discomfort on the right. (Tr. 199.) There was also significant diffuse tenderness with palpitation. (Tr. 199.) Dr. Kaplansky's impressions were that Listenberger had chronic diffuse pain with a significant myofascial component, a previous diagnosis of fibromyalgia, and peripheral polyneuropathy. (Tr. 199.) He recommended additional testing and continued her off work pending the tests and the follow-up appointment. (Tr. 199.)

During Listenberger's June 27 visit, Dr. Kaplansky indicated that imaging studies, a bone scan, a cervical spine MRI, and lab work were all essentially unremarkable. (Tr. 189.) On examination, Dr. Kaplansky observed that Listenberger looked comfortable, that there was diffuse four quadrant muscular tenderness, and that there was no swelling or peripheral edema "although subjectively she feels this." (Tr. 189.) Dr. Kaplansky recommended seeing a psychologist and increased her Neurontin. (Tr. 189.)

Listenberger had three appointments with Dr. Kaplansky during August 2002, where she reported low back and lower limb symptoms as well as fatigue. (Tr. 182, 186-87.) Dr. Kaplansky performed injections for Listenberger's low back pain on August 14 and August 28. (Tr. 180-81, 183-84,187.) At a follow-up appointment, Listenberger reported that she felt "well" after the second epidural injection but that the relief only lasted a few days. (Tr. 177.) On September 17, Dr. Kaplansky wrote a letter "pertaining to [Listenberger's] work status and disability," and

recommended the option of sedentary to light duty restrictions. (Tr. 176.)

After undergoing epidural injections for the right and left sacroiliac joints, Listenberger informed Dr. Kaplansky on October 23 that the injections helped but that she continued to have chronic pain. (Tr. 173, 175.) Dr. Kaplanksy continued her work restrictions, which were alternating between sitting and standing, no lifting over twenty pounds, no pushing/pulling over twenty pounds, no repetitive bending or twisting, and no climbing. (Tr. 173-74.) He indicated, however, that after a month, his goal was to lift her restrictions. (Tr. 175.)

Two years later, on October 25, 2004, Dr. Kaplansky circled an answer on a form indicating that Listenberger was limited to sedentary work.[6] (Tr. 479.) However, he did not respond when asked what medical findings supported his opinion. (Tr. 479.)

### 4. Frances R. Goff, Ph.D.

Upon Dr. Kaplansky's referral, Listenberger visited Dr. Goff on July 3, 2002, for psychological treatment of her chronic pain. (Tr. 202-04.) Before Listenberger's discharge on December 3, she had seven treatment sessions "without significant progress toward goals." (Tr. 202-04.) Upon discharge, Dr. Goff diagnosed personality disorder and pain disorder associated with psychological factors and a medical condition, opining a GAF of 60.[7] (Tr. 203.)

### 5. David Clark, M.D.

In February and March 2004, Listenberger visited Dr. Clark for abdominal pain. (Tr.

---

[6] Listenberger's counsel mailed this form to the ALJ that same day, which was twelve days after the administrative hearing. (Tr. 478.)

[7] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed., Text Rev. 2000). A GAF of 60 reflects "moderate symptoms" or "moderate difficulty in social, occupational, or school functioning." *Id.* at 34.

350-53.) Dr. Clark subsequently wrote a letter to Dr. Watson, indicating that the physical examination was "notable for her overweight state but [was] otherwise unremarkable" and that he prescribed medication for "potential" irritable bowel syndrome. (Tr. 352-53.) However, a subsequent colonoscopy and small bowel series were normal. (Tr. 337, 350.)

### 6. Consultative Examiners and Social Security Medical Consultants

On July 18, 2003, Dr. Michael Holton conducted a consultative physical examination, where Listenberger relayed a history of fibromyalgia and abdominal pain attributed to diverticulousis. (Tr. 270.) She described her symptoms as easy fatigability, poor sleep, and daily musculoskeletal pain and stiffness, explaining that she requires assistance with daily activities. (Tr. 270.) On physical examination, Dr. Holton observed moderate halting features with generalized stiffness when Listenberger got out of her chair and on and off the examination table. (Tr. 270.) He also noted that she had a normal gait and station and that she had moderate to marked bilateral lower extremity stiffness and significant instability on attempts at heel and toe walking. (Tr. 271.) The range of motion survey was characterized by marked generalized stiffness and overall fatigability. (Tr. 271.) Dr. Holton further observed palpable tenderness of essentially all the paraspinal areas and diminished muscular strength and tone. (Tr. 271.)

On August 1, 2003, A. Lopez, M.D., completed a Residual Functional Capacity Assessment Form, opining that Listenberger could lift twenty pounds occasionally and ten pounds frequently; could sit, push and/or pull, and stand and/or walk for six hours each; and could perform all postural functions occasionally. (Tr. 275-76.)  B. Whitley, M.D., affirmed Dr. Lopez's assessment. (Tr. 281.)

### B. The DIB Application Process

In a form completed for the Social Security Administration on June 11, 2003, Listenberger indicated that she was unable to perform two daily activities and could only perform the remaining six at a slower pace, explaining that she could not move fast due to pain and soreness. (Tr.124.) She also reported that she was tired, sore, and in pain all day; that on some days she needed to rest all day; that on other days she could be active for only two to three hours; and that she was able to perform activities for only two hours before she needed to rest. (Tr. 124.)      During an interview conducted by the Administration on August 28, 2003, the interviewer observed that Listenberger appeared to be in pain, that her hands were stiff and swollen, and that she walked very slowly and stiffly. (Tr. 131.)

### C. Testimony at the Administrative Hearing

Listenberger testified at the hearing that because she has "so much pain everywhere" and her muscles "get so sore," she cannot "even hardly walk or lift [her] arms sometimes." (Tr. 48.) She further explained that because of pain in her back and legs, she cannot bend or squat and has difficulty standing and sitting. (Tr. 50, 60.) When asked how often she experiences pain, she replied, "Every day. Every hour." (Tr. 51.)  She also indicated that a couple of times a week she is unable to get out of bed in the morning and that once a month she stays in bed for an entire day. (Tr. 55-56.) She testified that pain medication helps to take the "sharp edge off" her pain and that the intensity of her pain depends on what she does that day. (Tr. 51.) She also described having trouble concentrating and remembering things. (Tr. 54.)

Regarding her daily activities, Listenberger testified that she makes dinner and is able to do most of her self-care. (Tr. 56-57.) She further explained that on "a real good day," she will do the dishes and that on "a best day," she will do laundry. (Tr. 57.)  Explaining that her husband

10

does the "major shopping," she described having difficulty even with small shopping trips. (Tr. 58-59.) She further testified that she can no longer crochet, sew, or bowl because her hands swell and hurt. (Tr. 61.)

Listenberger's husband also testified briefly at the hearing.[8] When asked if her description of daily activities was consistent with his observations, he replied, "Yeah. And sometimes worse." (Tr. 63.) Specifically, he testified that she was becoming so forgetful that he was "about ready to make her quit driving," that she has a lot of trouble doing housework, that he has to help her around the house, and that she was in pain "just about 24 hours a day." (Tr. 63-64.) He closed by commenting that her pain and limitations were "[j]ust like she said . . . ." (Tr. 64.)

### III. STANDARD OF REVIEW

Section 405(g) of the Social Security Act ("Act") grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard.[9] *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir.

---

[8] In fact, her husband's testimony amounted to only one transcribed page. (*See* Tr. 63-64.)

[9] Generally, a remand for further proceedings by the Commissioner is the appropriate remedy when an ALJ's decision is not supported by substantial evidence. *Rohan v. Barnhart*, 306 F. Supp. 2d 756, 770 (N.D. Ill.

2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## IV. DISCUSSION

### A. Legal Framework

Under the Act, a claimant is entitled to DIB if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3).

In determining whether Listenberger is disabled as defined by the Act, the ALJ conducted the familiar five-step analytical process, which required him to consider the following

---

2004). On the other hand, an award of benefits is "essentially a factual finding best left for the [Commissioner] to address in the first instance, unless the record can yield but one supportable conclusion." *Campbell v. Shalala*, 988 F.2d 741, 744 (7th Cir. 1993); *see also Briscoe v. Barnhart*, 524 F.3d 345, 356 (7th Cir. 2005); *Rohan*, 306 F. Supp. 2d at 770; *see generally Burroughs v. Massanari*, 156 F. Supp. 2d 1350, 1367-68 (N.D. Ga. 2001) (articulating that the court may award DIB if "the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability *without any doubt*") (emphasis added). Here, Listenberger seeks an award of benefits as an alternative form of relief; however, as will be shown *infra*, the record does not "yield but one supportable conclusion." Therefore, an award of benefits is not appropriate.

issues in

sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a

severe impairment; (3) whether the claimant's impairment meets or equals one of the

impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the

claimant is unable to perform her past work; and (5) whether the claimant is incapable of

performing work in the national economy.[10] *See* 20 C.F.R. § 404.1520; *Dixon v. Massanari*, 270

F.3d 1171, 1176 (7th Cir. 2001). An affirmative answer leads either to the next step or, on steps

three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886

(7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads

to a finding the claimant is not disabled. *Id.* The burden of proof lies with the claimant at

every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

### B. The ALJ's Decision

In a written decision issued on March 4, 2005, the ALJ found that Listenberger was not

disabled. (Tr. 15-24.) The ALJ first determined that although Listenberger had engaged in

substantial gainful activity since her alleged onset date of January 15, 1999, she had not engaged

in substantial gainful activity since August 28, 2002. (Tr. 23.) He then found in Listenberger's

favor on step two, finding that her fibromyalgia was a severe impairment, but also finding that

she did not meet a listing at step three. (Tr. 23.) He then ascertained that Listenberger had an

RFC "to perform a full range of light work." (Tr. 23.) Based on this RFC, the ALJ found at step

four that Listenberger could perform her past relevant work as a screen painter and assembler.

---

[10] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite her limitations. 20 C.F.R. §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

(Tr. 23.) Therefore, Listenberger was not entitled to DIB. (Tr. 24.) In reaching this decision, the ALJ did not give "great weight" to Dr. Watson's opinion and found that Listenberger's allegations regarding her limitations were not totally credible. (Tr. 20, 23.)

Listenberger argues that the ALJ did not give "legally sufficient" reasons for discounting Dr. Watson's opinion and that the ALJ erred by failing to account for Dr. Kaplansky's 2004 opinion that she could perform only sedentary work. Furthermore, she contends that the ALJ erred when he discredited her allegations and when he failed to render a credibility determination regarding her husband's testimony. These arguments will be discussed in turn.

## C. The ALJ's Decision Not to Give Great Weight to Dr. Watson's Opinion Is Supported by Substantial Evidence

The opinion of a treating physician should be given great weight in disability determinations because of his or her greater familiarity with the claimant's conditions and circumstances. *Clifford*, 227 F.3d at 870. However, this principle is not absolute, as "a treating physician's opinion regarding the nature and severity of a medical condition is [only] entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford*, 227 F.3d at 870; *see also* 20 C.F.R. § 404.1527(d)(2); *Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002).[11]

_____

[11] In the event the treating physician's opinion is not given controlling weight, the Commissioner applies the following factors to determine the weight given to the opinion: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner. 20 C.F.R. §§ 404.1527(d), 416.927(d); *see also Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996).

Furthermore, contrary to many eager claimants' arguments, a claimant is not entitled to DIB simply because her treating physician states that she is "unable to work" or "disabled." *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001). The Commissioner, not a doctor selected by a patient to treat her, decides whether a claimant is disabled. *Id.*; 20 C.F.R. § 404.1527(e)(1).

Here, the ALJ decided not to give great weight to the opinion of Dr. Watson, finding that

> [t]here is no evidence in Dr. Watson's records of non-restorative sleep, morning
> stiffness, subjective swelling, irritable bowel syndrome, numbness, tingling, or
> vestibular dysfunction. There is also no evidence for the need to take a twenty-
> minute break every fifteen minutes and need[] to elevate her legs when sitting.
> The undersigned finds that this opinion of Dr. Watson is not supported by the
> objective medical evidence and does not give it great weight.

(Tr. 20.) Listenberger provides an exhaustive list of reasons for why she deems the ALJ's

decision to be "legally insufficient," which can essentially be placed into two categories: (1) the

ALJ allegedly engaged in selective review by failing to discuss certain evidence; and (2) the ALJ

allegedly made inaccurate statements that there was no evidence to support Dr. Watson's

opinions, when in fact there was evidence to support them. However, as the reader will see,

Listenberger cannot see the forest from the trees, since her arguments amount to mere nitpicking

at the ALJ's decision. *See Rice v. Barnhart*, 384 F. 3d 363, 369 (7th Cir. 2004) (explaining that

when reviewing the ALJ's decision, the court will "give the opinion a commonsensical reading

rather than nitpicking at it").

In fact, before turning our attention to Listenberger's specific arguments, it is beneficial

to review the broader fact at issue here–whether the ALJ's decision to not give great weight to

Dr. Watson's opinion is supported by substantial evidence. Indeed, we find that the ALJ's

decision is supported by substantial evidence. Before making his decision regarding Dr.

Watson's opinion, the ALJ reviewed Dr. Watson's clinical notes, which revealed essentially

normal physical examinations and reports that Listenberger's fibromyalgia was in stable

condition. The ALJ also accounted for Listenberger's daily activities and the other medical

evidence of record, which included numerous negative tests results. Furthermore, when

rendering his RFC determination, the ALJ stated that he "considered any medical opinions . . .

that reflect judgments about the nature and severity of the impairment and resulting limitations." (Tr. 22.) These medical opinions included two doctor's opinions that were inconsistent with Dr. Watson's opinion that Listenberger was essentially disabled: (1) Dr. Kaplansky's October 2002 opinion restricting Listenberger to light work, and (2) the State Agency physician's opinion that Listenberger could perform a full range of light work. Therefore, the ALJ's ultimate conclusion to discount Dr. Watson's opinion because it was not supported by objective medical evidence was supported by substantial evidence.

### *1. The ALJ Did Not Engage in Selective Review of the Evidence*

Listenberger argues that the ALJ engaged in selective review of the evidence because he discussed "only facts in favor of his findings without considering other contrary evidence." (Opening Br. in Social Security Appeal Pursuant to L.R. 7.3 18) (citing *Herron v. Shalala*, 19 F3d 329, 333 (7th Cir. 1994); *Clifford*, 227 F. 3d at 870; *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992)). However, an ALJ "need not provide a written evaluation of every piece of evidence that is presented," *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004), as long as the reviewing court is "able to trace the ALJ's path of reasoning." *Clifford*, 227 F.3d at 873. We find that the ALJ met his duty of minimal articulation.

### a. The ALJ Is Not Required to Discuss Every Detail in Dr. Watson's Clinical Notes

Listenberger argues that the ALJ engaged in selective review of Dr. Watson's clinical notes. Specifically, she contends that when the ALJ summarized Dr. Watson's October 9, 2003, clinical note, he failed to indicate that Listenberger complained of insomnia, "fibrofog," difficulty concentrating, and memory problems and that Dr. Watson observed diffuse tenderness on examination. She also contends that when the ALJ summarized Dr. Watson's January 6,

16

2004, note, he failed to mention Listenberger's complaints that she only had one good day out of the week, was not sleeping well, and remained off work and failed to account for Dr. Watson's observations that her fibromyalgia had not changed and that she still had joint pain, muscle pain, stiffness, and tiredness, for which he refilled her medications.[12]

If one were to credit Listenberger's arguments, a burden would essentially be placed on an ALJ whereby he or she would be compelled to recount every clinician's note in its totality or face the possibility of remand–a burden that, as we indicated above, is clearly not contemplated by Seventh Circuit Case law. *See, e.g.*, *Scheck*, 357 F.3d at 700; *Clifford*, 227 F.3d at 873.

Furthermore, despite Listenberger's contentions, the ALJ considered evidence from Dr. Watson's clinical notes that ran contrary to his decision that she was disabled. In fact, the ALJ's summary of Dr. Watson's notes included the following observations: (1) in December 2002, Listenberger "developed increased pain when vacuuming the entire house or shopping at more than one store"; (2) in April 2003, she "continued to have tenderness over the trapezius and right shoulder areas"; (3) in May 2003, she "developed neck pain when driving and had an increase in fatigue with increased activity"; (4) in May 2004, she "became sore and fatigued after any activity, [and] was unable to perform any job." (Tr. 18-19.) Thus, the ALJ ostensibly conducted a thorough review of the record, as he did not limit his review solely to the evidence that

---

[12] Listenberger also argues that when the ALJ wrote that she "did not have any difficulty with ambulation" on January 6, 2004, (Tr. 19) he mischaracterized the clinical note because Dr. Watson merely indicated that she was ambulatory. She then references numerous places in the record where doctors, including Dr. Watson, observed problems with her ambulation. This evidence, however, does not pertain to her ability to ambulate on January 6, 2004. Indeed, if the ALJ had instead wrote that on January 6, 2004, Dr. Watson indicated that Listenberger had difficulty with ambulation, that would have been a clear mischaracterization of the record. Therefore, Listenberger's argument amounts to mere nitpicking at the ALJ's choice of words. *See Rice*, 384 F. 3d at 369.

supported his decision.[13]

### b. The ALJ Was Not Required to Specifically Evaluate Dr. Watson's Opinion that Listenberger Would Miss More Than Four Days of Work Per Month

When rendering his decision, the ALJ mentioned Dr. Watson's opinion that Listenberger would miss more than four days of work per month and later concluded generally that "the opinion of Dr. Watson is not supported by objective medical evidence." (Tr. 18.) Listenberger asserts that Dr. Watson's opinion was supported, arguing that the ALJ should have accounted for Dr. Watson's numerous work excuses and her attendance records from the Tokheim Corporation.[14]

In fact, the ALJ was not even required to make specific mention of Dr. Watson's opinion that Listenberger would miss more than four days of work a month; therefore his failure to address the above evidence cannot not constitute legal error. SSR 96-2p provides that "[a]djudicators must use judgment based on the facts of each case in determining whether, and the extent to which, it is necessary to address separately each medical opinion from a single source." Because we conclude that the ALJ met his burden of minimal articulation when finding generally that Dr. Watson's opinions were not supported by objective medical evidence, he did not err when declining to specifically evaluate Dr. Watson's opinion regarding how many days

---

[13] Listenberger further nitpicks at the ALJ's decision by pointing out that the ALJ wrote that she could only walk through one-half of a flea market, when the record actually indicates she could walk through only one-quarter of it. The ALJ's statement, while inaccurate, reveals that he took into account her limitations when performing activities and further supports our conclusion that he reviewed contradictory evidence when rendering his decision.

[14] The records from the Tokheim Corporation reveal that she took numerous FMLA leaves, personal days, and vacation days, ultimately leading to a warning for poor attendance. However, Listenberger concedes a fatal flaw with her argument–these records do not link her absences to her underlying medical condition.

Listenberger would be absent from work.[15]

### c. The ALJ Committed No Error by Not Specifically Addressing Dr. Watson's Opinion That Listenberger's Psychiatric Conditions Affected Her Ability to Function

Listenberger asserts that when he discounted Dr. Watson's opinion, the "ALJ also failed to consider that Dr. Watson took into account the incremental effect of [her] non-severe psychiatric problems on her symptoms and limitations."[16] (Opening Br. 22.) As discussed above, however, SSR 96-2p does not mandate that an ALJ address every opinion rendered by a treating physician. Here, the ALJ's detailed discussion of Dr. Watson's Residual Functional Capacity Questionnaire reveals that he gave proper consideration to Dr. Watson's opinions. Thus, he committed no error by not specifically addressing Dr. Watson's opinion that emotional factors contributed to the severity of her symptoms.[17]

_____

[15] Listenberger also contends that the ALJ failed to account for her difficulties when performing daily activities, but it is difficult to understand why she raises these arguments here, since she provides little in the way of explanation as to how these difficulties specifically support Dr. Watson's opinions. Presumably, she is arguing that they support the opinions that she would miss more than four days of work a month, that she needs to take breaks, or, more generally, that she is disabled. However, in order for the accounts of her difficulties to support any of Dr. Watson's opinions, one must first find them credible. *See* SSR 96-7p ("In general, the extent to which an individual's statements about symptoms can be relied upon as probative evidence in determining whether the individual is disabled depends on the credibility of the statements.") Since we will conclude *infra*, Part IV.E, that the ALJ's decision to discredit Listenberger was supported by substantial evidence, we need not consider her arguments here.

[16] When making this argument, Listenberger explains that Dr. Ko's opinion that her symptoms would be made worse by emotional stress supports Dr. Watson's opinion that emotional factors contributed to the severity of her symptoms. Because we conclude that the ALJ did not need to address this specific opinion by Dr. Watson, he committed no error in failing to account for Dr. Ko's purported supporting opinion.

[17] Listenberger seemingly changes her argument in her Reply Brief, arguing that the ALJ erred not because he failed to specifically address Dr. Watson's opinion, but because he failed to account for the incremental effects that her psychiatric problems had on her other conditions. Thus, any attempt by Listenberger to assert this argument through her Reply Brief is deemed waived. *Damato v. Sullivan*, 945 F.2d 982, 988 n.5 (7th Cir. 1991) (emphasizing that "arguments that are raised for the first time in a reply brief are waived").

But even if we consider this argument, Listenberger still is unsuccessful. The ALJ specifically addressed Listenberger's psychiatric conditions in his opinion, noting that she visited Dr. Goff seven times and that she "had mild to moderate symptoms of pain disorder and personality disorder and did not make significant progress toward her counseling goals." (Tr. 18.)  He later noted that although she experiences depression, "she did not participate in

*2. The ALJ's Purported Inaccurate Statements Do Not Require a Remand*

<u>a. The ALJ Committed No Improprieties When He Stated That There Was No Evidence to</u>

<u>Support Dr. Watson's List of Listenberger's Alleged Symptoms</u>

The ALJ decided not to give great weight to Dr. Watson's opinion in part because there was "no evidence in Dr. Watson's records of non-restorative sleep, morning stiffness, subjective swelling, irritable bowel syndrome, numbness, tingling, or vestibular dysfunction." (Tr. 20.) Listenberger focuses on the ALJ's use of the phrase "no evidence," contending that the ALJ took an "extreme" position. When arguing her position, she seemingly suggests that even a scintilla of evidence that she has one of these symptoms would be enough for remand. But as it turns out, she is once again nitpicking at the ALJ's decision. The evidence she advances as allegedly corroborating Dr. Watson's list of symptoms are mostly one-time findings, one-time subjective complaints,[18] or one-time complaints to other doctors,[19] which is not enough to find that the

---

mental health treatment long enough to receive any benefit and she has only mild limitations in her activities of daily living, social functioning and concentration, persistence, and pace due to a mental disorder." (Tr. 21.) Thus, the ALJ did not turn a blind eye to her minimal psychiatric problems and subsequently did not err when assessing them. *Cf. Clifford*, 227 F.3d at 873 ("The ALJ, rather than blind himself to this condition (and other relevant evidence), should have considered the weight issue with the aggregate effect of her other impairments."); *see also Johnson v. Barnhart*, 449 F.3d 804, 807 (7th Cir. 2006) (citing *Mendez v. Barnhart*, 439 F.3d 360, 363 (7th Cir. 2006); *Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir. 2005)) (rejecting claimant's argument that the ALJ "failed to explore the possible effects of her obesity," which purportedly aggravated her joint problems, particularly since her obesity was not an "extreme" problem).

[18] For example, Listenberger points to a one-time reference in Dr. Watson's records to tingling in the hands.

[19] For example, Listenberger points to a one-time clinical note authored by Dr. Ko indicating that she has a poor sleep pattern and unrefreshed sleep, a one-time complaint of subjective swelling to Dr. Kaplansky, and a one-time note authored by Dr. Kaplansky indicating that she experiences paresthesias. She argues that the ALJ was required under SSR 96-2p to consider these notes when evaluating whether Dr. Watson's list of symptoms was supportable. Specifically, she contends that SSR 96-2p requires an ALJ to consider the claimant's entire medical record when analyzing the "supportability" of a treating physician's opinion. However, SSR 96-2p contains no such requirement. The purpose of SSR 96-2p is "[t]o explain . . . when treating source medical opinions are entitled to *controlling weight* . . . ." SSR 96-2p (emphasis added). When undertaking the controlling weight analysis, other doctor's opinions play no role on the "supportability" prong; which requires an ALJ to give controlling weight to a treating source's medical opinion only if it is well-supported by the treating source's own medically acceptable clinical and laboratory diagnostic techniques. *See* SSR 96-2p.

ALJ's conclusion was not supported by substantial evidence even if his conclusion was not entirely accurate. *See Stephens*, 766 F.2d at 287 ( "[T]he court review[s] judgments, not opinions. The statute requires us to review the quality of the evidence, which must be "substantial," not the quality of the ALJ's literary skills.").

In fact, much of the evidence Listenberger advances as corroborating Dr. Watson's list does not support those symptoms. Listenberger asserts that the Commissioner was "playing doctor" when she responded to Listenberger's arguments. To the contrary, Listenberger was the one playing doctor by stretching the medical evidence to suit her needs. Indeed, in most instances she provides no medical reasoning as to why her proffered evidence equates to a given symptom that Dr. Watson listed. But as the reader will see, the ALJ properly questioned the validity of Dr. Watson's list of symptoms.

For example, there is no indication that Dr. Watson, or any other doctor, ever diagnosed Listenberger with irritable bowel syndrome. Instead, the record merely provides that Dr. Clark once prescribed her medication for "potential" irritable bowel syndrome, a diagnosis which was contravened by a normal colonoscopy and small bowel series.

Similarly, Listenberger attempts to stretch a one-time complaint of stiffness as supporting Dr. Watson's listing of morning stiffness. Morning stiffness, however, "typically occurs on arising and gradually improves with activity only after an hour or two." The Merck Manuals,

---

Instead, other doctor's opinions are considered only to the extent that they are "not inconsistent" with the treating physician's opinion. In fact, for an opinion to be deemed "not inconsistent," it "need not be supported directly by all of the other evidence (i.e., it does not have to be consistent with all the other evidence) as long as there is no other substantial evidence in the case record that contradicts or conflicts with the opinion." SSR 96-2p; *see also Dominguese v. Massanari*, 172 F. Supp. 2d 1087, 1100 (E.D. Wis. 2001) (opining that the ALJ erroneously applied the "not inconsistent" standard because "[u]nder the standard imposed by the ALJ, the opinion only has controlling weight if the record supports it"). Thus, those other doctor's notes were not required to be considered under SSR 96-2p since they ostensibly did not conflict with Dr. Watson's opinion.

Online Medical Library, Symptoms and Diagnosis of Musculoskeletal Disorders,

http://www.merck.com/mmhe/sec05/ch059/ch059b.html (last visited July 17, 2006).

In addition, Listenberger contends that her numerous complaints of fatigue and insomnia,

her Ambien prescription, and her complaint that her pain kept her awake at night is evidence of

non-restorative sleep. However, her complaints, which are essentially that she *cannot sleep*, are

not the equivalent of non-restorative sleep, which occurs when a sufferer does not feel better

*after sleeping*. *See* The Doctor's Lounge.net, Fibromyalgia,

http://www.thedoctorslounge.net/rheumatology/diseases/fibromyalgia.htm (last visited July 17,

2006).

Finally, Listenberger concedes that she has never been diagnosed with vestibular

dysfunction.  However, she argues that there is indeed evidence of this condition because Dr.

Watson indicated that she had recurring earaches with headaches and that she had a history of

tympanoplasty.[20] (Tr. 253, 435.) These reported problems seemingly have little to do with a

diagnosis of vestibular dysfunction, which is commonly associated with chronic dizziness and

postular instability. The Merck Manual of Geriatrics, Chronic Dizziness and Postural Instability,

http://www.merck.com/mrkshared/mmg/sec2/ch19/ch19a.jsp (last visited July 17, 2006).

### b. The ALJ Committed No Improprieties When He Stated That There Was No Evidence to Support Dr. Watson's  Opinion that Listenberger Needed to Elevate her Legs

When the ALJ decided not to give great weight to Dr. Watson's opinion, he found that

there was no evidence for Dr. Watson's opinion that Listenberger needs to elevate her legs when

---

[20] Listenberger also indicates that her past medical history included three surgeries on her right ear. (*See* Tr. 148.) However, this medical history was composed by Listenberger herself, with no support in the medical record. Furthermore, there is no indication that these surgeries were for vestibular dysfunction.

sitting. Listenberger counters that a note authored by Dr. Watson indicates that she had trace edema in her calves and that he recommended her to elevate her legs as much as possible.[21] However, a lower extremity venous ultrasound conducted the next day was normal, revealing no edema. Furthermore, this one-time note was made more than two years before Dr. Watson rendered his RFC opinion, with no subsequent notes recommending that she elevate her legs. Therefore, similar to our reasoning above, Listenberger's limited evidence in favor of her need to elevate her legs is not enough to overturn the ALJ's determination. *See Stephens*, 766 F.2d at 287; *Rice*, 384 F. 3d at 369.

c. The ALJ Committed No Improprieties When He Stated That There Was No Evidence to Support Dr. Watson's  Opinion that Listenberger Needed to Take Twenty Minute Breaks Every Fifteen Minutes

When rendering his decision regarding the weight to afford Dr. Watson's opinion, the ALJ wrote that there was no evidence for Dr. Watson's opinion that Listenberger needs to take twenty minute breaks every fifteen minutes. Listenberger asserts that this finding was inaccurate because of the many references in the record to her pain and fatigue.[22] She further argues that because she has fibromyalgia, her subjective complaints of pain and fatigue are not subjective symptoms but instead are medical signs; thus her complaints of pain and fatigue are transformed into objective medical evidence.

---

[21] Listenberger also contends that Dr. Watson's records reveal that she reported pain along the lateral part of her thigh and knee and that she had knee pain at the joint line. However, she does not explain how this equates to a need to elevate her legs, particularly since Dr. Watson never recommended she do so after she made these complaints.

[22] Listenberger also mentions that her daily activities support her need to take breaks, but these activities will be addressed *infra*, Part IV.E.

In order to analyze Listenberger's arguments one must first understand the evaluation of subjective symptoms, such as pain and fatigue, in a disability determination. SSR 96-4p provides:

> No symptom or combination of symptoms by itself can constitute a medically determinable impairment. In claims in which there are no medical signs or laboratory findings to substantiate the existence of a medically determinable physical or mental impairment, *the individual must be found not disabled at step 2* of the sequential evaluation process . . . .

SSR 96-4p (emphasis added). When subjective symptoms such as pain and fatigue "can be shown by medically acceptable clinical diagnostic techniques," they are deemed to be medical "signs" that can support a finding of fibromyalgia as a severe impairment at step two. *See* SSR 96-4p n.2. Here, the ALJ never questioned that Listenberger had fibromyalgia, since he found that it was a severe impairment at step two.

Instead, the ALJ questions Listenberger's allegations regarding the severity of her pain and fatigue. Nothing in SSR 96-4p mandates that an ALJ must accept a claimant's allegations regarding that severity of her pain and fatigue as objective medical "signs." Indeed, if an ALJ were forced to accept the claimant's allegations as objective evidence, then a credibility determination would be unnecessary, and a claimant with fibromyalgia would essentially be guaranteed a finding of disability based merely on the fact that she complained to her doctor that her symptoms were severe. Such a conclusion runs contrary to Seventh Circuit case law. *See Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 200) (finding an ALJ's credibility determination was supported by substantial evidence because the "ALJ found that Powers did indeed suffer some pain from her [fibromyalgia], but that the medical evidence did not support the extent of pain to which she complained"); *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) (opining

24

that in most cases fibromyalgia is not disabling); SSR 96-7p ("Once the existence of a medically

determinable physical . . . impairment[] that could reasonably be expected to produce pain or

other symptoms has been established, adjudicators must recognize that individuals may

experience their symptoms differently and may be limited by their symptoms to a greater or

lesser extent . . . .").

Thus, the ALJ did not need to credit Listenberger's allegations regarding the severity of

her pain and fatigue as objective medical evidence. As such, there is no objective medical

evidence to support Dr. Watson's extreme opinion that Listenberger needed to take twenty

minute breaks every fifteen minutes.[23]

### D. Any Error the ALJ Committed By Not Noting Dr. Kaplansky's Opinion That Listenberger Could Perform Sedentary Work Was Harmless

Listenberger contends that the ALJ erred by not mentioning that in October 2004, two

years after he last provided care to her, Dr. Kaplansky circled an answer on a form indicating

that she was limited to sedentary work. By circling this answer, Dr. Kaplansky rendered an

opinion on Listenberger's RFC, which is an issue reserved to the Commissioner. *See* 20 C.F.R. §

404.1527(e); SSR 96-5p. While "opinions from any medical source on issues reserved to the

Commissioner must never be ignored," such opinions are not entitled to "special significance."

SSR 96-5p.[24] Accordingly, the ALJ should have accounted for Dr. Kaplansky's opinion.

---

[23] Indeed, according to the form that Listenberger completed for the Administration, she is able to perform activities for two hours before needing to rest.

[24] Although in her Opening Brief Listenberger improperly cites to 20 C.F.R § 1527(d) in support of her argument, she correctly fixes this mistake in her Reply Brief, citing SSR 96-5p. *Compare* 20 C.F.R § 404.1527(d) ("[W]e will evaluate every *medical opinion* we receive.") (emphasis added), *with* 20 C.F.R § 404.1527(e) ("Opinions on some issues, such as [the claimant's RFC], *are not medical opinions* . . . but are, instead, opinions on issues reserved to the Commissioner . . . .") (emphasis added), *and* SSR 96-5p.

However, any error the ALJ committed by failing to mention Dr. Kaplansky's opinion is harmless. *See Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004) (citing *Keys v. Barnhart*, 347 F.3d 990, 994-95 (7th Cir. 2003)) (finding harmless error when a remand would not affect the outcome of the case). When making his RFC determination, the ALJ reviewed Listenberger's daily activities and her medical records, which included numerous negative test results, essentially normal physical examinations, reports from Dr. Watson that her fibromyalgia was in stable condition, and the 2002 work restrictions of Dr. Kaplanskly limiting Listenberger to light work.[25] As we noted *supra*, Part IV.C.1.a, the ALJ also considered evidence that ran contrary to his decision. The ALJ ultimately concluded that the record supported an RFC of light work, a decision that is supported by substantial evidence. Thus, a remand for consideration of Dr. Kaplansky's opinion, which in any event is not entitled to any "special significance," would ostensibly not affect the ALJ's RFC determination.

Furthermore, the value of Dr. Kaplansky's 2004 opinion is tenuous for two additional reasons.[26] First, he merely circled an answer on a form, declining to provide reasons for his

---

[25] Listenberger contends that Dr. Kaplansky's 2002 work restrictions should be given little weight, arguing that they were only temporary and, therefore, revealed nothing about her permanent ability to do work. This argument is odd because in the same clinical note, Dr. Kaplansky indicated his permanent goal was for her to return to work with absolutely no restrictions after the expiration of one month. Thus, Listenberger's own argument seemingly cuts against her.

[26] Listenberger argues that the two reasons that follow violate the *Chenery* doctrine, which is the principle whereby courts cannot consider *post hoc* justifications that attempt to salvage deficient decisions by administrative agencies. *See SEC v. Chenery Corp.*, 318 U.S. 80, 83-85 (1943); *Mengistu v. Ashcroft*, 355 F.3d 1044, 1046-47 (7th Cir. 2004). However, "the harmless-error doctrine is available in judicial review of administrative action" as an "exception to the *Chenery* principle." *Sahara Coal Co. v. Office of Workers' Comp. Programs*, 946 F.2d 554, 558 (7th Cir. 1991) (holding that "if the outcome on a remand is foreordained, we need not order one"); *see also Mengistu*, 355 F.3d at 1047. Here, we invoke the harmless error doctrine as an exception to the *Chenery* doctrine, finding that a remand would not affect the outcome of this case for the reasons we will discuss below.

opinion when asked to do so. *See* SSR 96-5p (providing that it is appropriate to consider the supportability of the opinion when evaluating a doctor's opinion on an issue reserved to the Commissioner); *Dixon*, 270 F. 3d at 1177 (finding that an ALJ's decision to reject a treating physician's opinion was supported by substantial evidence where the doctor "expressed [his] opinion by writing 'yes' next to a question that Dixon's attorney had pre-typed[] . . . [and] did not elaborate on the basis for this opinion").

Dr. Kaplansky's 2004 opinion is also suspect because it conflicts with the earlier work restrictions he rendered in 2002, when he last rendered care to Listenberger. *See Griffith v. Callahan*, 138 F.3d 1150, 1155 (7th Cir. 1998) (holding that the ALJ "reasonably rejected" a doctor's opinion that the claimant was unable to work because "not only did [the doctor] fail to support his later opinion with objective findings of deterioration," but also because this opinion contradicted the doctor's earlier opinion that the claimant could work). Thus, it is clear that a remand for the ALJ to consider Dr. Kaplansky's 2004 opinion limiting Listenberger to sedentary work would not effect the outcome of the case.[27]

---

[27] Listenberger contends that the ALJ's error was not harmless because on remand, the ALJ would be obligated to contact Dr. Kaplansky so that he may provide support for his 2004 opinion and explain any conflicts between this opinion and his 2002 opinion. *See* SSR 96-5p ([I]f the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator must make 'every reasonable effort' to recontact the source for clarification of the reasons for the opinion.")

However, when a claimant is represented by counsel at the administrative hearing, the ALJ is entitled to presume that the claimant has advanced her best grounds for recovery. *Sears v. Bowen*, 840 F.2d 394, 402 (7th Cir. 1988). The ALJ has the discretion then to determine whether the evidence put forth by the claimant is adequate to decide the issue of disability or whether additional information is necessary. *Skarbek*, 390 F.3d at 504 (citing 20 C.F.R. § 404.1512(e)) ("An ALJ need re-contact medical sources only when the evidence received is inadequate to determine whether the claimant is disabled. . . . Here, the evidence was adequate for the ALJ to find [claimant] not disabled . . . ."). Here, Listenberger's counsel provided the ALJ the form from Dr. Kaplansky, knowing that it did not contain an explanation. Thus, the ALJ is entitled to presume that Listenberger provided her best grounds for disability. Furthermore, the amount of evidence was adequate for the ALJ to conclude that Listenberger was not disabled; therefore, he did not need to re-contact Dr. Kaplansky for an explanation.

**E. The ALJ's Decision to Discredit Listenberger was Supported by Substantial Evidence**

Because the ALJ is in the best position to evaluate the credibility of a witness, his decision is entitled to special deference. *Powers*, 207 F.3d at 435. If an ALJ's determination is grounded in the record, and he articulates his analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988); *Ottman v. Barnhart*, 306 F. Supp. 2d 829, 838 (N.D. Ind. 2004), creating "an accurate and logical bridge between the evidence and the result," *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000), his determination will be upheld unless it is "patently wrong." *Powers*, 207 F.3d at 435; *see also Carradine v. Barnhart*, 360 F.3d 751,754 (7th Cir. 2004) (remanding an ALJ's credibility determination because the ALJ's decision was based on "serious errors in reasoning rather than merely the demeanor of the witness").

Here, after reviewing Listenberger's complaints and daily activities as well as the medical record, the ALJ determined that her "description of her limitations exceeds medical substantiation, is not consistent with other evidence and is not credible." (Tr. 21-22.) Listenberger argues that the ALJ's credibility determination was not adequately articulated because it "contains no references to evidence [sic] record and is not sufficiently specific to permit a full and fair review of the credibility finding." (Opening Br. 23.) *See* SSR 96-7p ("The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision.").

Listenberger's contentions are utterly without merit. In the three paragraphs immediately preceding the ALJ's credibility determination, he summarized the medical evidence, which

included numerous negative test results, essentially normal physical examinations, reports from Dr. Watson that her fibromyalgia was in stable condition, and the 2002 work restrictions of Dr. Kaplansky limiting Listenberger to light work. Thus, the ALJ provided a detailed and specific list of reasons for dashing Listenberger's credibility on the basis that her alleged limitations exceed medical substantiation.[28] *See* SSR 96-7p ("The determination . . . must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."); *Powers*, 207 F.3d at 435 (articulating that a doctor's opinion that claimant's fibromyalgia was "stable" was enough evidence to support that claimant was limited, "but not to the completely debilitating extent [claimant] alleged").

Furthermore, the ALJ noted Listenberger's daily activities, ultimately concluding that Listenberger's description of her limitations was not "consistent with other evidence and is not credible." (Tr. 22.) Listenberger contends, yet again, that the ALJ engaged in selective review of the evidence because he did not specifically discuss her complaints that vacuuming and shopping caused her to have pain that would last for several days. The ALJ, however, is not required to consider every piece of evidence, as long as his path of reasoning can be traced. *Scheck*, 357 F.3d at 700; *Clifford*, 227 F.3d at 873. In fact, it is not the case that the ALJ merely engaged in

---

[28] The Commissioner also makes the following arguments in support of the ALJ's decision to discredit Listenberger: (1) She discontinued treatment with two specialists; (2) Dr. Ko did not opine any limitations; and (3) Dr. Watson did not provide Listenberger with the type of treatment and medication consistent with disabling fibromyalgia. However, these are impermissible *post hoc* arguments, and we cannot consider them. *See Wates v. Barnhart*, 288 F. Supp. 2d 947, 950 (E.D. Wis. 2003) (emphasizing that in reviewing an ALJ's decision, the court is confined to the reasons the ALJ provided and cannot supply its own reasons or rely on the Commissioner's *post hoc* rationalizations).

selective review without considering contrary evidence. For example, the ALJ noted

Listenberger's reports that she was unable to walk through an entire flea market, required

assistance with shopping, could only sit or stand for an hour, could only walk one block, could

only climb one flight of stairs, and spent most of her time in bed.[29]

Listenberger also argues that the ALJ committed legal error by failing to consider the

observations of the interviewer for the Administration, who noted that Listenberger appeared to

be in pain, that her hands were stiff and swollen, and that she walked very slowly and stiffly. *See*

SSR 96-7p ("In evaluating the credibility of the individual's statements, the adjudicator must

also consider any observations recorded by SSA personnel . . . ."). However, any error the ALJ

made by failing to note these comments in his decision was harmless. *See Skarbek*, 390 F.3d at

504. As mentioned above, the ALJ provided a thorough list of reasons for dashing Listenberger's

credibility, detailing a record that included medical evidence and descriptions of her daily

activities. *Diaz v. Chater*, 55 F. 3d 300, 308 (quoting *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir.

1995) ("Because we can 'track the ALJ's reasoning and be assured that the ALJ considered the

---

[29] In Listenberger's Reply Brief, she provides an extensive list of other complaints that she claims the ALJ failed to mention, but most of these complaints were considered by the ALJ. For example, he noted throughout his opinion that Listenberger reported soreness, being easily fatigued, and that she spends most of her time in bed. He also mentioned her husband's testimony that she is in pain twenty-four hours a day.

In addition, Listenberger asserts a new argument in her Reply Brief–that the ALJ failed to make the distinction between the ability to engage in some activities and the ability to sustain work. *See Mendez*, 439 F.3d at 362-63 (cautioning ALJs "against placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home," since "[t]he pressures, the nature of the work, flexibility in the use of time, and other aspects of the working environment as well, often differ dramatically between home and office or factory or other place of paid work."); *Gentle*, 430 F.3d at 867 (emphasizing that an ALJ must not casually equate household work with employment in the labor market); *Carradine*, 360 F.3d at 755 (remanding an ALJ's credibility determination when the ALJ failed "to consider the difference between engaging in sporadic physical activities and [the claimant's] being able to work eight hours a day five consecutive days a week"). Because she waited until her Reply Brief to assert this argument, it is deemed waived. *Damato*, 945 F.2d at 988 n.5.

Even if we consider the argument, it lacks merit. Contrary to Listenberger's assertions, the ALJ did not casually equate an ability to engage in some household activities with an ability to sustain employment. Instead, he used her ability to perform daily activities as one factor in reaching his credibility determination, which is what an ALJ is supposed to do. *See* 20 C.F.R. § 404.1529(c); SSR 96-7p.

important evidence, we believe that the ALJ has met the minimal articulation standard.'") (internal citations omitted).

**F. The ALJ Committed No Error by Not Rendering a Credibility Determination Regarding the Testimony of Listenberger's Husband**

Listenberger argues that because the ALJ failed to make a credibility determination regarding the brief testimony of her husband, it is unclear whether the ALJ even considered this testimony. (Opening Br. 23.) It is evident, however, that the ALJ considered it, as he summarized the testimony in his decision. (*See* Tr. 21.) But even if the ALJ had not mentioned her husband's testimony, he still would not have committed a legal error.

Although an ALJ "need not evaluate in writing every piece of testimony and evidence submitted," when an ALJ ignores an entire line of evidence, his decision falls "below the minimal level of articulation required." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). If, however, testimony is "redundant," an ALJ does not need to independently evaluate it, since the testimony is not a separate line of evidence. *Id.*; *see also Books v. Chater*, 91 F.3d 972, 980 (7th Cir. 1996); *Herron v. Shalala*, 19 F.3d 329, 337 (7th Cir. 1994); *Brandenburg v. Social Sec. Admin.*, No. 104CV01376DFHWTL, 2005 WL 2148119, at *6 (S.D. Ind. Aug. 2, 2005).

In the cases cited above, the claimants brought essentially the same challenge that Listenberger asserts here. In *Carlson*, for example, the claimant objected to the ALJ's failure to specifically discuss his wife's testimony, but the Seventh Circuit found that the testimony "essentially corroborated Carlson's account of his [symptoms] and his daily activities" and therefore was "essentially redundant." *Carlson*, 999 F.2d at 181; *see also Books*, 91 F.3d at 980 (finding that claimant's brother's testimony was not a separate line of evidence but instead

"served strictly to reiterate, and thereby corroborate, Books's own testimony concerning his activities and limitations").

By his own admission, the testimony of Listenberger's husband regarding the effects of her fibromyalgia merely served to corroborate Listenberger's own testimony. In fact, he ended by indicating that her pain and limitations were "[j]ust like she said." (Tr. 64.) Therefore, her husband's testimony is deemed redundant, and the ALJ did not need to specifically address it.[30]

## VI. CONCLUSION

In sum, the ALJ's decisions not to give Dr. Watson's opinion great weight and to discredit Listenberger were supported by substantial evidence. Furthermore, any error the ALJ committed by failing to note Dr. Kaplansky's 2004 opinion limiting Listenberger to sedentary work was harmless. Finally, the ALJ was not required to render a separate credibility determination regarding the testimony of Listenberger's husband. Therefore, the decision of the Commissioner is AFFIRMED.  The Clerk is directed to enter a judgment in favor of the Commissioner and against Listenberger.

SO ORDERED.

Enter for July 18, 2006.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge

---

[30] In her Reply Brief, Listenberger argues that her husband's testimony is a separate line of evidence because it "supports the opinions of Dr. Watson with respect to her fatigue, pain, and difficulty concentrating." (Reply Br. 15.) Even if we accept Listenberger's assertion that her husband's testimony "supports" Dr. Watson's opinion, she does not offer any legal explanation as to how the testimony constitutes a separate line of evidence. Indeed, her Opening Brief concedes that her husband's testimony is merely corroborating, and therefore is ostensibly redundant under *Carlson*. (*See* Opening Br. 24.) ("This testimony not only supports Ms. Listenberger's claims of disability, but it is important because it *corroborates* the medical opinions of Dr. Watson with respect to Ms. Listenberger's fatigue, pain, and difficulty concentrating.") (emphasis added).